# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 10, 2025

Lyle W. Cayce
Clerk

No. 24-60309

———————

STATE OF MISSISSIPPI; UNITED STATES OF AMERICA

*Plaintiffs—Appellants*,

*versus*

JXN WATER,

*Defendant—Appellee*,

———————————————————

UNITED STATES OF AMERICA,

*Plaintiff*,

*versus*

CITY OF JACKSON, MISSISSIPPI,

*Defendant*.

———————————————————

Appeal from the United States District Court
for the Southern District of Mississippi
USDC Nos. 3:12-CV-790, 3:22-CV-686

———————————————————

Before SMITH, HIGGINSON, and DOUGLAS, *Circuit Judges*.

DANA M. DOUGLAS, *Circuit Judge*:

No. 24-60309

This appeal involves various failures of Jackson, Mississippi's water-related utilities. In two consolidated enforcement actions, the district court ruled that a court-appointed federal receiver operated a "[f]ederal assistance program" under the Food and Nutrition Act of 2008 ("FNA") by setting municipal utility rates and, therefore, was entitled to access data governing recipients of the Supplemental Nutrition Assistance Program ("SNAP"). We now consider for the first time the definition of a "[f]ederal assistance program" under the FNA. For the reasons that follow, we REVERSE the district court's order and REMAND for further proceedings in accordance with this opinion.

I

A

The FNA establishes SNAP, a federal benefit program assisting low-income households to afford nutritious food. 7 U.S.C. §§ 2011–2036d. Typically, a household is SNAP-eligible when its financial resources "are determined to be a substantial limiting factor in permitting them to obtain a more nutritious diet." *Id.* § 2014(a). States voluntarily participate in and administer the SNAP program, *id.* §§ 2013(a), 2020(d), but must meet federal requirements and be approved by the Department of Agriculture ("USDA"). *Id.* § 2020(d). When a state participates in SNAP, it becomes responsible for accepting and approving applications and keeping records, while the USDA monitors compliance. *Id.* § 2020. If a state fails to comply, the USDA may withhold funds from the state as appropriate. *Id.* § 2020(g).

In Mississippi, the Mississippi Department of Human Services ("MDHS") administers SNAP and maintains records of its recipients. 18-14 Miss. Code R. § 1.2. Pursuant to federal rules protecting the data security of SNAP recipients, Mississippi has enacted various laws prohibiting disclosure of information received from SNAP applicant

households, unless the disclosure is otherwise permitted by federal law. MISS. CODE ANN. § 43-1-19(1). Further, the State has enacted various regulations prohibiting disclosure of "[n]ames and addresses or lists of [SNAP] applicants and recipients"; rather, an adult household member must provide written consent. 18-14 MISS. CODE R. §§ 1.11(B)(1), (C).

B

1

In 2012, the United States and State of Mississippi brought an enforcement action under the Clean Water Act ("CWA") against the City of Jackson (the "City"), alleging that the City violated both the CWA and the Mississippi Air and Water Pollution Control Law by allowing raw sewage to be discharged into state and federal waterways. On the day the action was filed, the parties proposed a consent decree, which the district court ultimately adopted and entered in 2013. Under the consent decree, which remains active today, the City is to take remedial actions to bring the sewage system into compliance with both the CWA and the Mississippi anti-pollution law. The decree will remain active until the United States determines that the City is fully compliant, and that it has completed all other terms and conditions of the decree.

Meanwhile, Jackson's water supply system faced challenges. "The City of Jackson stands out among large water systems across the nation as having an unusually high number of water outages, line breaks[,] and treatment violations." Indeed, between 2017 and 2021, Jackson suffered line breaks at an average annual rate of 55 breaks per 100 miles of line—nearly four times the industry benchmark.

In 2020, the Environmental Protection Agency ("EPA") issued an Emergency Administrative Order to the City, identifying that there was a substantial risk that its drinking water contained disease-causing organisms,

including *Cryptosporidium*, *Giardia*, *Legionella*, and *E. coli*. The parties in the CWA enforcement action informed the court of the EPA's participation in bringing the City's public water system into compliance under the Safe Drinking Water Act ("SDWA"). The Emergency Order was resolved by a Consent Order, which established a repair plan to address the water system's deficiencies. However, the City consistently failed to comply with this Consent Order and remained non-compliant with federal law.

In August 2022, excessive rainfall overwhelmed Jackson's water system. The Pearl River flooded surrounding areas, causing debris to block multiple plants' water intake systems and the City's distribution system to experience a pressure loss. The system consequently failed to provide an adequate quantity or quality of water, with most residents losing the ability to use or drink water safely. Several emergency announcements followed: the mayor issued an emergency proclamation, the governor a state of emergency, the Mississippi State Department of Health a public health emergency, and the President of the United States a federal emergency, alongside various other emergency proclamations. It took the City approximately one week to restore water pressure and service.

Subsequently, on November 29, 2022, the United States brought an enforcement action under the SDWA. The complaint explained that contaminants entered the drinking water, endangering the health of Jackson residents. It also detailed the City's failure to comply with the EPA's previous administrative orders. On the day the United States filed the SDWA action, the court entered an interim stipulated order appointing Edward Henefen as interim third-party manager ("ITPM") over the City's water system and its billing and collections arm.

Henefin's duties include operating and managing the water system. He established JXN Water, Inc., through which he operates the water

system; the order appointing Henefin was subsequently amended to include JXN Water.[1] The SDWA suit was stayed, with the interim stipulated order remaining in effect until final judgment. Soon thereafter, the court consolidated the 2012 and 2022 suits and entered a stipulated order in the CWA suit, appointing Henefin (and in turn JXN Water) as the ITPM over the sewer system.

In accordance with the court's orders, Henefin developed new rates for the water and sewage systems as he deemed necessary. These rates incorporated a seventy-five percent discount of monthly meter-availability charge for residents receiving SNAP benefits.[2]

2

For JXN Water to implement the tiered rate plan, it required SNAP recipient data. Accordingly, in February 2024, the ITPM filed a motion requesting that the district court order the disclosure of the names, phone numbers, and email addresses of SNAP recipients in thirty-two ZIP codes in the Jackson area. In the ITPM's view, this would "efficiently and rapidly provide access to safe drinking water" for all ratepayers, since cross-comparison between SNAP recipients and JXN Water's ratepayers was "[t]he only practical way to timely implement that rate classification." The United States and Mississippi, while agreeing with the policy, disagreed with the means of implementation, arguing that disclosure would substantively violate the FNA's protections of SNAP recipients' privacy.

After filing the motion, the ITPM worked with both the United States and Mississippi to consider alternative proposals for implementing the

_____

[1] We refer to Henefin, the ITPM, and JXN Water interchangeably.

[2] SNAP recipients would pay $10 per month, while other residential customers would pay a minimum of $40 per month.

discounted rate without exposing SNAP recipients' privacy. The MDHS, while not a named party itself,[3] also sent a letter to the court, expressing its opposition on the ground that disclosure of SNAP recipients' information could result in the loss of federal funding. Following oral argument and receipt of the MDHS's letter, the ITPM withdrew its motion and refiled a motion one week later requesting the quarterly disclosure of the names and addresses of SNAP recipients in thirty-two ZIP codes. The district court granted the motion over the United States's opposition, finding the prompt implementation of the rate schedule "critical." It also found that the disclosure did not violate the law because the adopted rates fell within an exception of the FNA: disclosure is permitted "to persons directly connected with the administration or enforcement of the provisions of [the FNA], regulations issued pursuant to [the FNA], [f]ederal assistance programs, or federally-assisted [s]tate programs." 7 U.S.C. § 2020(e)(8)(A)(i). It concluded that the ITPM's proposed rate setting was "the equivalent of a federal assistance program," and disclosure therefore did not violate the law.

The United States and the State of Mississippi filed notices of appeal.[4] The United States moved to stay the order pending appeal, which the district court granted during the pendency of these proceedings. We must first assure ourselves that we have appellate jurisdiction over this interlocutory appeal before considering the merits.

_____

[3] MDHS is not a named party to either enforcement action. The State of Mississippi is a named plaintiff in only the CWA enforcement action.

[4] The State first filed a notice of appearance in the SDWA action.

## II

We always have jurisdiction to determine our own jurisdiction. *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 390 (5th Cir. 2006). Cases presumptively fall outside of this court's limited jurisdiction, thus placing the burden on the parties to establish its existence. *Ashley v. Clay County*, 125 F.4th 654, 659 (5th Cir. 2025).

Title 28 U.S.C. § 1291 provides courts of appeals with "jurisdiction of appeals from all final decisions of the district courts," thus typically requiring a decision "by which a district court disassociates itself from a case." *In re Deepwater Horizon*, 793 F.3d 479, 483 (5th Cir. 2015) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995)). Some doctrines, however, create narrow openings for non-final judgments to be appealed.

Among these is the collateral order doctrine, which "is 'best understood not as an exception' to this finality rule, 'but as a practical construction of it.'" *Id.* (quoting *Will v. Hallock*, 546 U.S. 345, 349 (2006)). In essence, it provides jurisdiction over a "'small class' of pre-judgment orders that 'finally determine claims of right separable form, and collateral to, rights asserted in the action [and that are] too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.'" *Id.* at 483–84 (alteration in original) (quoting *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 498 (1989)). Therefore, we have jurisdiction where the appealed order (1) conclusively determines a disputed question; (2) resolves an important issue separate from the merits of the matter; and (3) is functionally unreviewable on appeal from a final judgment. *Id.* at 484.

These conditions are "stringent." *Id.* (quoting *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994)). Because expansion of the doctrine could result in the rule being swallowed, it is treated gingerly and

rarely invoked. *See id.* at 484, 491. Some orders traditionally fall within this doctrine, such as those rejecting absolute or qualified immunity, the denial of a state's claim to the Eleventh Amendment's protections, and a ruling against a criminal defendant's double jeopardy defense. *Id.* at 484–85. These orders "implicate weighty public interest concerns," with each one containing "some particular value of a high order." *Id.* at 485 (quoting *Will*, 546 U.S. at 352). Other orders, however, are traditionally unappealable under this doctrine, including denials of motions to enforce forum selection clauses, discovery orders, and attorney disqualification decisions. *Id.* This order falls neatly into none of these clear-cut appealable or non-appealable categories.[5]

First, the appealed order conclusively determines a disputed question: whether the ITPM's SNAP rate schedule is a federal assistance program under 7 U.S.C. § 2020(e)(8)(A)(i). The district court's order found that the schedule "is the equivalent of a federal assistance program" and noted that the relief would assist the ITPM in efficiently identifying water and sewer rates for citizens of limited means. This, in turn, would "further[] the purposes of the SNAP federal assistance program." It concluded by stating: "For good cause shown, the Court finds that, for the purpose of this Order and to implement the Stipulated Orders in this matter, the ITPM's adopted rates are a 'federal assistance program' and the motion should be GRANTED on that ground." This is a conclusive determination of a disputed question of law.

Second, the issue is important and separate from the merits of the matter. The underlying case consists of two consolidated enforcement

---

[5] While JXN Water contends that this was a discovery order, the record shows that discovery was stayed.

actions, the objectives of which are to bring the City into compliance with environmental laws including the CWA and the SDWA. Indeed, the ITPM position itself was created as a means to bring the City into compliance. But never was it the duty of the ITPM to assist in administering SNAP or to "further[] the purposes of the SNAP federal assistance program."[6] Instead, in carrying out his duties as the ITPM, Henefin realized that more individuals would pay their utility bills if certain changes were made to the rates. It was through this lens that SNAP came into view. Surely, there is a relation to the stipulated orders and the ITPM's duties thereunder. But the legal issue itself is unrelated to those underlying the orders and consent decree.

The issue also satisfies the "importance" requirement. *See In re Deepwater Horizon*, 793 F.3d at 484 & n.4 (noting that "'[i]mportance' has sometimes been characterized as a discrete fourth requirement and other times been wrapped up in an analysis of both the second and third requirements," and ultimately identifying it as "a significant component in the jurisdictional analysis under this doctrine"). Each recipient's privacy over their financial status and eligibility for SNAP is at stake. Congress itself recognized this importance, protecting against the non-consensual disclosure of recipients' personal information with few exceptions. 7 U.S.C. § 2020(e)(8). Here, the district court found a third party, unrelated to the administration of SNAP (or any identified federal assistance program), issued federal assistance in part because the ITPM is designated as an officer of the court and furthers the goals of SNAP. The propriety of that finding is

_____

[6] Even if JXN Water argued that the federal assistance program at issue was not SNAP itself but general federal assistance through the enforcement actions, it has failed to show that the court's order could qualify as a federal assistance program that is intertwined with the underlying merits of the case.

an issue for the merits; at this point, it need only be an "important" issue of statutory construction. This ruling has significant impacts on recipients throughout the Jackson area, and it could have lasting implications over recipients' privacy in later litigation.

Finally, the issue must be functionally unreviewable on appeal at final judgment. This requirement is satisfied. First, the CWA consent decree operates as its own judgment, so no final judgment will follow. Second, and more importantly, once the confidential information of the SNAP recipients is released, no relief can make the information confidential again. After all, the toothpaste cannot be put back into the tube. *See Vantage Health Plan, Inc. v. Willis-Knighton Med. Ctr.*, 913 F.3d 443, 448 (5th Cir. 2019) (noting that orders "to unseal a document cannot be undone" because "once confidential information is released, *there is no going back*" (emphasis added)). The data will have been exposed to a third party—one unrelated to the administration of a federal assistance program—but there will be no way of undoing the harm suffered by these individuals. Accordingly, this issue is of the type that is functionally unreviewable on appeal.

All three elements place this order squarely within the narrow collateral order doctrine. We therefore have appellate jurisdiction and proceed to the merits.

## III

Questions of statutory interpretation are reviewed de novo. *Carder v. Cont'l Airlines, Inc.*, 636 F.3d 172, 174 (5th Cir. 2011).[7] The district court

---

[7] Because the parties discuss appellate jurisdiction in the context of injunctive relief, their briefing focuses on the abuse of discretion standard that governs such suits. *See Thomas v. Hughes*, 27 F.4th 363, 367 (5th Cir. 2022). But it does not matter whether we adopt the more deferential "abuse of discretion" standard here, because "a trial court's failure to properly analyze the law or apply it to the facts is an abuse of discretion." *Id.*

ordered that the United States and Mississippi provide SNAP recipient data to JXN Water, reasoning that JXN Water, as ITPM of the public utilities, operated a federal assistance program. Both the United States and Mississippi challenge this premise, providing arguments regarding (1) plain text; (2) statutory history; and (3) the impacts of the federal government's role in the consent decrees. Because the statute and its history suggest that JXN Water does not implement, administer, or otherwise participate in a federal assistance program through its rate setting, we reverse.

## A

First, the parties contest the plain text of the statute governing disclosure of SNAP recipients' data. 7 U.S.C. § 2020(e)(8) reads as follows: "The [s]tate plan of operation required under subsection (d) of this section shall provide, among such other provisions as may be required by regulation[,] safeguards which prohibit the use or disclosure of information obtained from applicant households . . . ." However, disclosure is permitted without consent of the household in specific circumstances: "the disclosure of such information to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, [f]ederal assistance programs, or federally-assisted [s]tate programs." 7 U.S.C. § 2020(e)(8)(A)(i).

The United States and Mississippi argue that this text prohibits disclosure of the information described in the order. After all, the statute requires that each state safeguard against disclosure of recipient households' information. True enough. However, since the statute permits disclosure to

---

(quoting *Maiz v. Virani*, 311 F.3d 334, 338 (5th Cir. 2002)). Since the only question before us is one of statutory interpretation, the standard of review would revert to de novo.

administrators of a "[f]ederal assistance program," we must determine whether JXN Water's utility rate setting falls within that definition.

The statute leaves the term "[f]ederal assistance program" undefined. Therefore, we interpret it pursuant to its "ordinary and natural meaning and the overall policies and objectives of the statute." *Cheapside Minerals, Ltd. v. Devon Energy Prod. Co., L.P.*, 94 F.4th 492, 499 (5th Cir. 2024) (quoting *NPR Invs., L.L.C. ex rel. Roach v. United States*, 740 F.3d 998, 1007 (5th Cir. 2014)). The United States argues that federal assistance programs are those "administered by the federal government and [that] operate under laws passed by Congress, in contrast with those administered by state, county, or municipal governments."[8] It provides a list of federal assistance programs as defined by the General Services Administration ("GSA") in 2 C.F.R. § 200.203(a)(i) to demonstrate that this was not a federal assistance program.

JXN Water counters by claiming that the term is without qualification. Thus, it argues, the statutory objectives permit a far broader interpretation of the term—one that would include the ITPM's activity. In support of its position, JXN Water relies on the fact that the City suffered a weather event that triggered a federal public health emergency, after which the federal government invoked the jurisdiction of a federal court to enforce a federal statute. Accordingly, because the government spent hundreds of

---

[8] Mississippi, for its part, states that "a responsible agency, plus congressional or executive-branch authorization [] define[s] and distinguishe[s] 'federal assistance programs' from other public or private programs." It relies on the General Services Administration and Office of Management and Budget shared catalog of Federal Domestic Assistance from 2008 to show that, at the time the statute was passed, the programs in the catalog—which was the official "government-wide compendium of [f]ederal programs, projects, services, and activities" and "basic reference source of [f]ederal programs"— contained these features. *Catalog of Federal Domestic Assistance*, Off. of Mgmt. and Budget & U.S. Gen. Servs. Admin., at I (2008) (accessible at https://bit.ly/4canrii).

millions of dollars to assist the City, and because rate setting directly related to its role in the enforcement actions, JXN Water asserts that its actions must qualify as providing *federal* assistance.

JXN Water's arguments are unavailing. A "[f]ederal assistance program" under 7 U.S.C. § 2020(e)(8)(A)(i) clearly implies administration by an arm of the federal government. As an initial matter, and as the United States points out, the FNA confirms that Congress contemplated the difference between levels of government. In the very same subsection as that at issue here, the statute excludes "federally-assisted [*s*]*tate* programs." 7 U.S.C. § 2020(e)(8)(A)(i) (emphasis added). This alone suggests that where the statute uses the term "[f]ederal," it does so to explicitly exclude state programs, and likely those beneath that level. But we need not hang our hat on this ambiguity: the Act also permits disclosure to "*local*, [s]tate, or [f]ederal law enforcement officials for the purpose of investigating an alleged violation of this chapter." *Id.* § 2020(e)(8)(C) (emphasis added).[9] The inclusion of the term "local" within the same subsection demonstrates Congress's intent to only include *federal* activity for federal assistance plans, which, of course, comports with the plain text. *See Brown v. Gardner*, 513 U.S. 115, 120 (1994) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the

---

[9] JXN Water cites this exception, among others, to show a series of "narrowly-tailored exceptions suggest[ing] that Congress's broader and unqualified use of the term '[f]ederal assistance programs' was intentional and meant to encompass much more than [the United States and Mississippi] assert, including programs like the ITPM's adopted rate schedule." But, despite some exceptions that specifically list "agencies of the Federal Government," 7 U.S.C. § 2020(e)(8)(D), the fact remains that Congress intentionally excluded the terms "local" and "state." That "[f]ederal assistance program" appears to cast a broader net than do other uses of "federal" does not make its definition boundless.

disparate inclusion or exclusion." (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))).

Further, the district court vested JXN Water with the power to set *municipal* water and sewer rates. The municipal code provides for the annual review and revision of the water service charge system to ensure proper rates. Jackson, Miss., Code of Ordinances § 122-273. The court itself defined "rate" as "rates and amounts required to be paid for water services per month by customers of the City waterworks as prescribed in Section 122-268 and Section 122-269 of the Code of Ordinances, City of Jackson, Mississippi." It further described the ITPM's duties to include "meet[ing] with the City to discuss the need to adjust the Rate structure, the Rates under the existing or a modified Rate structure, and any fees that the City charges customers for water utilities." It ultimately required the mayor to propose an amendment consistent with the ITPM's recommended rates under the Code of Ordinances of Jackson, Mississippi. The ITPM clearly derives its rate-setting authority from a non-federal source.

None of this considers other agency interpretations of the term "[f]ederal assistance plan." As described above, the GSA has promulgated a rule requiring public notice of federal financial assistance programs on its website, which includes SNAP and Supplemental Security Income, among other federally run programs. 2 C.F.R. § 200.203(a)(1); *Assistance Listings*, https://sam.gov/data-services/Assistance%20Listings/datagov/2025/01-Jan?privacy=Public (last visited March 6, 2025). It is true that "interpretation of a statute or regulation from one agency does not bind another's interpretation of that material." *Tex. Truck Parts & Tire, Inc. v. United States*, 118 F.4th 687, 693 n.4 (5th Cir. 2024). Nor does it automatically bind this court's. But that does not mean that one agency's interpretation cannot inform others' interpretations; rather, the applicability of a definition across agencies is dictated by context and common sense. In

this setting, the programs in the GSA's listing clearly comport with the plain-text interpretation of the statute at issue. The GSA's interpretation is therefore informative.

Finally, JXN Water's argument that the statute is ambiguous—and should therefore be read broadly—fails. In support, it cites *United States v. Marmolejo*, 89 F.3d 1185, 1189 (5th Cir. 1996), in which a criminal defendant challenged his bribery conviction. The defendant, the Sheriff of Hidalgo County, had entered agreements "to establish and govern relations between the U.S. Marshals Service and Hidalgo County," including federal participation in jail construction predicated upon a need for additional space for federal prisoners. *Id.* The statute under which Marmolejo was convicted restricted its applicability to agencies that received benefits "under a [f]ederal program involving a grant, contract, subsidy, loan, guarantee, insurance or other form of [f]ederal assistance." *Id.* (quoting 18 U.S.C. § 666(b)). And, since the statute's plain text was ambiguous, we turned to legislative history, which supported a broad interpretation. *Id.* Both agreements heavily governed the interactions between federal entities, so the court found that the funds stemmed from "[f]ederal assistance." *Id.*

This is inapposite. First, *Marmolejo* focused on a criminal statute relating to bribery—a far cry from the FNA. Second, the bribes in *Marmolejo* came from *agencies* operating such federal assistance programs. *Id.* Contrast that with the case here, which prevents disclosure of data, unless the individual is *directly connected* with the administration or enforcement of the provisions of SNAP or some other federal assistance program. 7 U.S.C. § 2020(e)(8)(A)(i). The ITPM was not appointed to participate in, administer, enforce, or otherwise operate SNAP. Indeed, the term "SNAP" never shows up as part of the ITPM's duties, obligations, authorities, or otherwise in the interim stipulated order. And the ITPM's duties involve carrying out the direct orders of a district court—not to

administer a program set forth by law.   Third, as explained below, the statutory history supports a finding here that "[f]ederal assistance programs," when initially written, identified federally funded or administered programs.

Accordingly, to the extent that the district court ordered the release of this information because the "rates are the functional and legal equivalent of a federal assistance program," it erred.  *See Tex. Truck Parts*, 118 F.4th at 692 (declining to accept "an illogically broad definition" of a statutory term). The rate-setting authority stems directly from the municipal code, and all rate setting must ultimately be authorized by the mayor in accordance with that code.   This alone is sufficient to support reversal.   Nevertheless, statutory history lends additional support.

B

The United States, through a lengthy discussion of the statutory history of the FNA, asserts that the statutory amendments, made most recently in 1985, demonstrate a focus upon federally administered programs.

The FNA's predecessor, the Food Stamp Program, permitted disclosure of recipients' data only to "persons directly connected with the administration and enforcement of" the law and any regulations promulgated pursuant to the law. 7 U.S.C. § 2019(e)(3) (1976).  Soon thereafter, however, Congress amended the statute, permitting the sharing of data between the Food Stamp Program and other federal programs. 7 U.S.C. § 2020(i) (Supp. II 1978).  Following this amendment, the USDA promulgated a regulation dictating that "[u]se or disclosure of information obtained from applicant households . . . shall be restricted to persons directly connected with the administration or enforcement . . . of the Food Stamp Act, or with other [f]ederal or federally aided, means-tested assistance programs such as Title IV-A (AFDC), XIX (Medicaid), or XVI (SSI)." 7 C.F.R. § 271.1(c)(1)

(1979). Finally, in 1982, Congress enacted the Food Stamp Amendments, in which it authorized the disclosure of food stamp data to those connected with the administration or enforcement of "[f]ederal assistance programs, or federally-assisted [s]tate programs," the language that remains today. 96 Stat. 779, § 169. Accordingly, the USDA issued a regulation noting that its proposed rule, issued in 1983, "deleted from the regulation the reference to specific programs and inserted broader statutory language." *Food Stamp Program; Disclosure of Information and Noncompliance with Other Programs*, 49 Fed. Reg. 48,677, 48,678–79 (1984).

The deleted language indicates the sorts of programs included in the initial directive: "Aid to Families with Dependent Children (AFDC), Medicaid, Supplemental Security Income (SSI), and General Assistance (GA) programs subject to the joint processing requirements." *Id.* at 48,678. While these specific examples were removed and replaced with broader language, they shed light on the original understanding of a federal assistance program. The mere fact that the language ultimately broadened does not create a boundless definition of "federal." Indeed, the language enshrined in the final statute very much mirrors the language from previous versions in which those examples were incorporated.

Instead, JXN Water argues that the statutory history demonstrates "an ever-widening exception that the USDA's implementing regulations sought to narrow." It argues that because the disclosure was gradually broadened, and because the USDA sought to impose non-statutory limitations that JXN Water asserts are improper, the term should be read more broadly. It finds further support in the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), which permits the federal government to provide assistance to state and local governments by "providing [f]ederal assistance programs for both public and private losses

sustained in disasters." 42 U.S.C. § 5121(b)(6). JXN Water claims that this definition clashes with those provided by the United States and Mississippi.

These arguments fail. The "ever-widening" nature of the FNA's disclosure requirements supports our reading. After all, despite the statute's continued widening of an exception to the rule, never has it taken the step of incorporating all activities funded by the federal government, nor has it incorporated those local or state actions that support or otherwise further the ideals set forth in federal programs. *See* 7 U.S.C. § 2020(e)(8)(A). As described above, the use of the terms "local" and "[s]tate" in the statute—but not in the relevant provision—suggests Congress's intent to exclusively refer to those programs administered by the federal government. That the exception has continually widened and still has not incorporated that language cuts against JXN Water's argument.

JXN Water's citation to the Stafford Act is equally as confusing. That statute permits the federal government to assist state and local governments in times of natural disasters and emergencies by providing funds, including through federal assistance. 42 U.S.C. § 5121(b)(6). This does not support a finding that the implementation of a municipal rate-setting schedule becomes a federal assistance program, especially for the purpose of the FNA. As the United States aptly points out, "[e]ven if federal programs that dispense federal disaster relief funds were considered 'federal assistance programs,' the ITPM is not dispensing federal disaster relief funds through his municipal rate schedule." There is no answer to this: the ITPM's activities, while related to a federal disaster, do not involve the disbursement of any emergency funds—at least not for the purpose for which the SNAP data is sought. Accordingly, the statutory history supports a finding that the programs to which the FNA refers are administered and enforced by the federal government.

C

Finally, it bears considering whether the sheer volume of federal involvement could transform JXN Water's activity into the provision of a federal assistance program. It cannot.

JXN Water argues that the City suffered a federal public health emergency, at which point the federal government invoked the jurisdiction of a federal court to enforce the SDWA, a federal statute. It further argues that since the ITPM is a federal trustee and an officer of the federal court, and because hundreds of millions in federal aid have been provided, the ITPM must be carrying out a federal assistance plan under the statute. The United States and Mississippi, on the other hand, claim that federal receivership carries no weight in the determination of whether a program is a federal assistance program. Instead, they emphasize that a federal receiver carries out the state laws to which they are bound.

Once again, JXN Water's arguments are unconvincing. A receiver "appointed in any cause pending in any court of the United States . . . shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the *State* in which such property is situated." 28 U.S.C. § 959(b) (emphasis added); *see also SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 840 (5th Cir. 2019) (quoting 28 U.S.C. § 959(b)). A common example for such a receivership is "when public health issues are implicated, such as mismanagement of a public water system." Jonathan P. Friedland, Strategic Alternatives for and Against Distressed Businesses § 14.4 (2025).

The mere appointment of a federal receiver—even if the individual or entity is considered an officer of the court—does not grant federal power to the receiver. Instead, the receiver's powers, while stemming from both a

No. 24-60309

statutory grant and "the court's equitable power to fashion appropriate remedies as 'ancillary relief' measures," *Stanford Int'l Bank*, 927 F.3d at 840 (quoting *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980)), fall in line with laws of the state, *see id.* (noting that the receiver's obligations stemmed from the laws of Texas). In other words, while JXN Water became an officer of the court and a federal receiver, its compliance with state and local law did not become a matter of federal law or administration of federal assistance.

This is unchanged by the fact that approximately $778 million of federal funding has been provided "to address the System's infrastructure and other needs."[10] These funds were provided by the federal government to assist Jackson's ailing sewage and water services. *See supra* note 10. But while these funds were issued to improve the systems, and while the ITPM's duties include "implementation of projects on the Priority Project List in accordance with the Implementation Schedule," the divulgence of SNAP recipient data does not advance the disbursement of federal funds or provision of federal assistance. That is, to the extent that the ITPM *does* act as an agent of a federal assistance program by contributing to the improvement of Jackson's water systems with federal funds stemming from grants,[11] the particular action for which it requests SNAP data—rate

---

[10] This funding includes: (1) $150 million for grants under the SDWA; $450 million to remain available for capitalization grants under the SDWA; (3) $2.8 million through an EPA grant; (4) $4 million through an additional EPA grant; (5) $125 million through the U.S. Army Corps of Engineers; and (6) $46 million under the American Rescue Plan Act.

[11] For instance, it contributes by paying bills related to the system from the Capital Improvements Account. We make no determination today regarding the ITPM's purported role in administering or enforcing a federal assistance program through such contributions.

setting—is unequivocally non-federal. All true legal authority stems from the city ordinances.

This reading comports with *Stanford International Bank*'s statement that a receiver is typically bound by the laws of the state. 927 F.3d at 840. Even assuming *arguendo* that some of a federal receiver's duties involve the administration of a federal assistance program, that does not create a broad grant that *all* activities associated therewith, stemming from a single consent decree, are federal assistance programs. After all, "the federal government cannot control, regulate, or otherwise administer the ITPM's rate schedule."

## D

For the reasons described above, the ITPM does not enforce or administer a federal assistance program under the statute's general terms. Because the district court improperly found that disclosure was appropriate under the statute, we do not address the State's arguments relating to sovereign immunity or personal jurisdiction.

## IV

Accordingly, we REVERSE the district court's order and REMAND for further proceedings in accordance with this opinion.